LaVERNE C. BASS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bass v. Commissioner
Docket No. 659-80.
United States Tax Court
T.C. Memo 1983-228; 1983 Tax Ct. Memo LEXIS 558; 45 T.C.M. (CCH) 1411; T.C.M. (RIA) 83228; April 26, 1983. Charles E. Purdy and Edward V. Brennan, for the petitioner. Karen J. Simonson, for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION RAUM, Judge: The Commissioner determined a $16,765 deficiency in petitioner's 1974 Federal income tax, as well as a $4,191 addition to tax under section 6651(a), I.R.C. 1954, for late filing of petitioner's 1974 return. The essential matter in dispute is whether petitioner is accountable for any portion of the 1974 income of Bass Chemical Company, a business owned as community property by petitioner and her husband James V. Bass, from whom she was separated throughout 1974. FINDINGS OF FACT Included herein by reference are the facts set forth in a "Stipulation of Facts" attached to respondent's First Request for Admissions which were admitted *559 by petitioner in her answer to the request, together with the exhibits attached to that "stipulation". Petitioner was a resident of LaJolla, California, at the time her petition was filed. Her 1974 Federal income tax return, dated February 15, 1977, was signed on her behalf by Alfred R. Milton as "Power of Attorney". It was received by the Los Angeles District Director on February 16, 1977. Petitioner married James V. Bass (James) on September 13, 1942. In 1960, they founded Bass Chemical Co. (BCC) with community assets and thereafter held and operated it as community property. BCC was a wholesale chemical distributorship; it purchased ehemicals from suppliers throughout the United States and re-sold them to industrial customers in San Diego and the surrounding area, including Mexico. BCC was essentially merely a jobber or distributor, and any required technical assistance was provided by the chemical manufacturers from whom it purchased its inventory. Its business premises were owned by petitioner and James as community property. It carried a substantial inventory. James was the "managing force" in the operation of BCC, and he supervised the work of a staff of some ten employees *560 including several "key" personnel. Petitioner worked at BCC from its founding until shortly after she separated from James in October 1972. At first she participated with him in soliciting new customers, but after about 1970 her duties were limited to bookkeeping, taking telephone orders, and waiting on "walk-in" customers. James was involved in all phases of BCC's operations. During 1974, however, the litigation concerning his divorce from petitioner absorbed much of his time and energy, and he relied to a greater extent on key employees, who handled the daily operations (including solicitation of new customers) under his general supervision. Petitioner and James did not cohabitate at any time during 1974. On November 21, 1974, the Superior Court of California for the County of San diego entered an interlocutory judgment concluding that petitioner and James were entitled to have their marriage dissolved. This judgment also provided for division of the community property, and set forth 28 separate items of community property, most of them of substantial value. The 27th item, listed as "(aa)" in paragraph 5 of that court's findings, consisted of "Inventory and assets" of *561 BCC on which was placed a value of $400,000 followed by a question mark. The real estate on which BCC's business was conducted was separately listed as item (e) and valued at $114,190. Further in respect of BCC the superior court made the following findings: 12. That [James] has been the managing force in the operation of Bass Chemical Company; that [James] does not desire that the Court award Bass Chemical Company to him; that [Petitioner] failed to show that the Court's awarding of Bass Chemical Company to her would be in her best interests. 13. That the business commonly known as Bass Chemical Company be sold and that the net proceeds be held in trust by [James'] attorney subject to the Court's approval of a final distribution. 14. That the net proceeds from the sale of Bass Chemical Company be used to equalize the division of property after the payment of certain debts and fees as hereinafter set forth. 15. That, pending the sale of Bass Chemical Company, [James] shall continue to operate and manage said business exercising his best business judgment in all transactions; that [James] and [petitioner] and their respective counsel take all steps necessary *562 to find a willing buyer for Bass Chemical Company; that [James] is awarded a salary of Twenty-five Thousand Dollars ($25,000.00) per year, payable weekly, commencing November 18, 1974, and continuing until the sale of Bass Chemical Company is accomplished or until further order of the Court; that [James] and [petitioner] draw equal amounts from the profits of Bass Chemical, (after salary for [James]), but in no event should their respective draws exceed Three Thousand Dollars ($3,000.00) per month; that [petitioner] be restrained and enjoined from disturbing, disrupting or interfering with [James'] management and operation of Bass Chemical Company, and from going to or about said premises except in the company of her accountant or counsel of record herein; that the books, records and accounts of said business shall be available to [petitioner's] representatives for examination at all reasonable times; that [James], as soon as reasonably possible, encumber the property awarded by this Court to him in a sum of Fifty Thousand Dollars ($50,000.00) and place said Fifty Thousand ($50,000.00) into the operating capital of Bass Chemical Company; that future mortgage payments, *563 taxes and associated costs on the real property shall be paid from the proceeds of the continuing operating of Bass Chemical Company effective August 6, 1974. 16. That any sale not approved of by one of the parties must be approved of by the Court prior to the close of escrow. 17. That the tax consequences of any sale of Bass Chemical Company are to be borne equally by the parties. 21. That the order to equally divide the community property of the parties, the Court will, at a future time, award to [petitioner] the real property commonly known as 70-15th Street [where BCC conducted its business] at a net equity of $114,190.00, or, its equivalent value should the subject property be included in the sale transaction involving Bass Chemical Company; that the Court therefore reserves jurisdiction to award that community property known as 70-15th Street; that, pending the award of the property or its equivalent value to [petitioner], [petitioner] shall assume liability for all encumbrances, past-due taxes and associated bills to the extent not otherwise provided for in Finding #15. 24. That the debts of the community as set forth in Paragraph 22 [ten separate items *564 of an aggregate value of $91,974.75] above not satisfied from the proceeds of the life insurance cash value withdrawal, shall be paid from the proceeds of the sale of Bass Chemical. Should said sale proceeds be insufficient to pay said debts, said debt shall be paid out of the community property of the parties prior to the final distribution thereof. [James] and [petitioner] are jointly and equally liable for each and every debt. James managed BCC throughout the remainder of 1974 and most of 1975, and operated it in a relatively normal manner, consistent with his continuing attempts to sell it as a going concern. However, these efforts proved unsuccessful, and BCC was liquidated during the first few months of 1976. From January 1 through November 17, 1974, James drew cash from BCC of not less than $1,200 per month for his own purposes, aside from any BCC assets used to support petitioner or pay community debts. From November 18 to December 31, James drew a salary at the annual rate of $25,000 in accordance with the interlocutory decree. He reported $2,885 as his salary from BCC on his 1974 Federal income tax teturn. The fair value of James' services prior to November 15, 1974, was *565 at the rate of $25,000 a year, and amounted to $25,000 minus $2,885, or $22,115, for the period January 1, to November 18, 1974.
James' 1974 Federal income tax return discloses BCC's 1974 income as $87,554. In the computation of that amount, a deduction of $2,885 was taken in respect of James' salary for the period November 18-December 31, 1974, but no deduction was taken in respect of James' services for the period prior to November 18, 1974. James included one-half of BCC's $87,554 reported income in his gross income, but petitioner reported no income from BCC on her separate return. The Commissioner determined that the $87,554 was community income, and accordingly increased petitioner's income by $43,777, namely, the other one-half of BCC's reported $87,554 income. [1] At issue is whether all or any part of the $43,777 attributed to the petitioner by the Commissioner must be included in her gross income for 1974. *566 OPINION It has long been established that a wife's ownership rights in community income render her taxable on one-half of such income, United States v. Malcolm,282 U.S. 792, 794 (1931); Poe v. Seaborn,282 U.S. 101, 113 (1930), and it is clear that the law imposes on her the obligation, and does not merely grant her the right, to report her share of the community income as her own. United States v. Mitchell,403 U.S. 190, 196 (1971). Furthermore, the wife's failure to "receive" her share of the income does not alter the incidence of tax liability, Kimes v. Commissioner,55 T.C. 774, 782 (1971); Hill v. Commissioner,32 T.C. 254, 257 (1959), and contrary to petitioner's contention, we find no constitutional infirmity in the application of this rule here. [2] Under California law, each spouse has a "present, existing and equal" interest in the community, Cal. Civil Code section 5105 (West 1970), and it can no longer be doubted that the wife's interest in community property under California law is sufficient to establish her liability for Federal income tax on her half of *567 the community income. Compare United States v. Malcolm,supra, with United States v. Robbins,269 U.S. 315, 327 (1926); see also United States v. Mitchell,supra, at 195-196. Given the foregoing, the dispute herein centers on whether BCC's 1974 income is properly characterized as community property, separate property, or part community and part separate. In general, California law provides that all property acquired during marriage is community property, [3] and it is undisputed that the Bass' marriage was not dissolved *568 during 1974. [4] Nevertheless, when spouses live "separate and apart", as petitioner and James did throughout 1974, the "earnings and accumulations" of a spouse are the separate property of that spouse. Cal. Civil Code section 5118 (West Supp. 1982). [5] Petitioner contends that all of BCC's 1974 income was in fact earned by James, and was therefore his separate property, because (it is asserted) his role in the business was so pervasive and so critical that the profits must be attributed to his efforts rather than to any community capital employed in the business. The Government counters that BCC was not the type of business that depended to a large extent on the skills of a particular individual, and that, in any event, James' role in the business was so severely limited in 1974 because of the divorce litigation that none of BCC's income was "earned" by him. *569 In Imperato v. Imperato,45 Cal. App. 3d 432, 119 Cal. Rptr. 590, 593 (Cal. Dist. Ct. App. 1975), it was said in reference to section 5118: "The word 'earnings' is broader in scope than 'wages' and 'salary.' It can encompass income derived from carrying on a business as a sole proprietor where the earnings are the fruit or award for labor and services without the aid of capital". In Romanchek v. Romanchek, 248 Cal. app. 2d 337, 56 Cal. Rptr. 360, 364 (Cal. Dist. Ct. App. 1967), the wife operated a "School of French Design" in which she was the sole worker. The school's income was said to result from the "personal character, ability, energy and capacity" of he wife, and it was held that all of the income earned after separation was her separate property. It may be seen, then, that merely because the income in question is that of a business does not preclude the possibility that some or all of it may be classified as the "earnings" of the proprietor. Instead, the critical determinant under section 5118 is the proportionality of the contributions of personal effort and community capital in producing the income. Compare Romanchek,supra, *570 with Shelton v. Shelton,118 Cal. App. 3d 811, 173 Cal. Rptr. 629, 632 (Cal. Dist. Ct. App. 1981); cf. Beam v. Bank of America,6 Cal. 3d 12, 490 P. 2d 257, 261, 98 Cal. Rptr. 137, 141 (1971) (In Bank). It is plain to us on the evidence submitted that the income of BCC was based in part upon its substantial business assets, which were community property, and only in part upon the personal efforts of James which may properly be classified as his separate earnings. BCC was a going concern with substantial inventory and other assets together with an operating staff including several "key" employees who were obviously knowledgeable about BCC's affairs, and BCC as a going concern was community property. We are thoroughly satisfied that, unlike the situation in Romanchek, the bulk of BCC's profits had its source in community property and was not solely based upon James' efforts so as to constitute his separate income. However, we are also satisfied that James did contribute significantly, albeit to a lesser degree, to the profits of the enterprise. An allocation is obviously required. A persuasive guide in making such an allocation may be *571 found in the order of the superior court awarding a salary of $25,000 a year to him, commencing November 18, 1974, for "continu[ing] to operate and manage [BCC's] business" (emphasis supplied). In accordance with that order, James took salary payments in the aggregate amount of $2,885 for the period November 18-December 31, 1974, [6] and that salary was deducted in computing BCC's net income of $87,554 for the full year of 1974. We accept that salary as reasonable and as reflecting the value of the services rendered by James during that period. The record is in a less satisfactory condition in respect of the period prior to November 18, 1974, and is indeed in a state of some confusion. Although James took no salary for that period *572 he did take "draws" in amounts that were not less than $1,200 a month and may have been at the rate of $25,000 a year. To be sure, James was distracted to a certain extent by the divorce litigation and probably did not spend as much time on the affairs of BCC as might otherwise normally be the case. He was nevertheless the chief executive and operating officer of the business, and we think that a $25,000 annual salary may fairly be ascribed to him for the entire year as representing his separate earnings. We find that the fair value of his services was $25,000 for the entire year, and it is only to that extent that BCC's 1974 profits represent James' separate earnings. Accordingly, in order to compute the amount of 1974 community income from BCC, its income for that year must be reduced by $25,000. But James' $2,885 salary for the period November 18-December 31 has already been subtracted in arriving at $87,554 as BCC's net income for 1974.That figure must therefore be reduced by only the remaining portion of $25,000 -- namely $22,115 ($25,000 minus $2,885) -- to compute BCC's income that was exclusive of James' separate "earnings". The resulting figure, $65,439, represents community *573 income of BCC that is allocable equally to petitioner and James. As a consequence, the amount properly allocable to petitioner is $32,719.50 (1/2 X $65,439), which will be reflected in the computation to be made under Rule 155.
Although we have not sustained the Government's position in every respect, the Government must prevail on the other items of income and loss which the parties agreed would be decided by our resolution of the BCC issue (see n. 1, supra). We have held that petitioner is accountable for her one-half share of all items of income or loss attributable to community, and petitioner has not attempted to show that any of these other items remaining in dispute are not community income or community loss, as was determined by the Commissioner. Petitioner has not raised any issue in respect of the addition to tax for late filing, either in her petition or on brief, nor was any evidence introduced on this point at trial. Because petitioner bears the burden of showing that the failure to file the return timely was due to reasonable cause and not due to willful neglect, see Neubecker v. Commissioner,65 T.C. 577, 586 (1975), the Commissioner's determination *574 of petitioner's liability for an addition to tax must be sustained. Decision will be entered under Rule 155.
Footnotes
1. The Commissioner also determined that two other items of income and one item of loss shown on James' return were attributable to community property, and petitioner's income was therefore adjusted to reflect one-half of each amount. Although these items are also in dispute, the parties have agreed that our resolution of the issue presented in respect of the BCC income will likewise dispose of the controversy in respect of these other three items.↩
2. Apart from the well-established rule that it is of no significance whether a wife actually "receives" her share of the community income, petitioner's contention that she did not receive any part of BCC's earnings for 1974 is highly misleading. The evidence convincingly establishes that such earnings to the extent that they exceeded $25,000 ascribed to salary for James were either poured back into the business, or used in respect of other community property, or paid out in discharge of community debts. Petitioner thus in fact received the benefit of her share of those earnings in excess of James' salary.↩
3. Cal. Civil Code sec. 5110↩ (West 1970). 4. Although the interlocutory judgment was entered on November 21, 1974, that decree did not effect a dissolution of the marriage. Green v. Green,66 Cal. App. 2d 50, 151 P. 2d 679, 682 (Cal. Dist. Ct. App. 1944); Riddell v. Guggenheim,281 F. 2d 836, 842 (9th Cir. 1960). Instead, a period of six months must elapse before a final judgment of dissolution may be entered.Cal. Civil Code sec. 4514↩ (West 1970). The record does not disclose when such final judgment was entered, although it of course could not have been before the end of 1974. 5. Sec. 5118. Separate property; earnings of spouse and children after separation The earnings ad accumulations of a spouse and the minor children living with, or in the custody of, the spouse, while living separate and apart from the other spouse, are the separate property of the spouse.↩
6. James' salary was paid on a weekly basis, and there were six full working weeks in 1974 from November 18 through December 31. At the rate of $480.77 per week ($25,000 / 52), his salary for those six weeks would total $2,885, rounded to the nearest dollar. That was precisely the amount of salary that James reported as having received from BCC in 1974, and the amount that was deducted in computing BCC's income of $87,554 for that year.↩