NANCY A. LUCIA, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; FLOYD JOSEPH LUCIA, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lucia v. Commissioner
Docket Nos. 1892-87, 2296-87
United States Tax Court
T.C. Memo 1991-77; 1991 Tax Ct. Memo LEXIS 92; 61 T.C.M. (CCH) 1982; T.C.M. (RIA) 91077; February 27, 1991, Filed *92 Decisions will be entered under Rule 155. Thomas H. McPeters, for petitioner Nancy A. Lucia. Floyd Joseph Lucia, pro se. Joseph E. Mudd and Laura Karlak, for the respondent. PARR, Judge. PARR
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in and additions to petitioners' Federal income tax as follows: Nancy A. Lucia
docket No. 1892-87. Additions to tax
Taxable year ending
Deficiency
Sec. 6653(b)/(b)(1)
Sec. 6653(b)(2) [1]
December 31, 1977
$ 56,908.95
$ 28,454.48
-
December 31, 1978
63,737.44
31,868.72
-
December 31, 1979
75,161.58
37,580.79
-
December 31, 1980
123,856.00
61,928.00
-
December 31, 1981
184,109.00
92,054.50 -
December 31, 1982
51,106.00
25,553.00
*
December 31, 1983
63,153.00
31,576.50
*
Taxable year ending
Sec. 6654(a)
Sec. 6661(a)
December 31, 1977
$ 1,997.66
-
December 31, 1978
2,029.08 -
December 31, 1979
3,139.32
-
December 31, 1980
7,893.00
-
December 31, 1981
14,111.04
-
December 31, 1982
4,976.00
$ 5,110.60
December 31, 1983
3,757.54
6,315.30
*93 Floyd Joseph Lucia
docket No. 2296-87. Additions to tax
Taxable year ending
Deficiency
Sec.6653(b)/(b)(1)
Sec. 6653(b)(2)
December 31, 1977
$ 58,212.45
$ 29,106.23
-
December 31, 1978
65,171.14
32,585.57
-
December 31, 1979
77,016.48
38,508.24
-
December 31, 1980
125,953.90
62,976.95
-
December 31, 1981
186,313.10
93,156.55
-
December 31, 1982
53,013.40
26,506.70
*
December 31, 1983
65,368.95
32,684.48
*
Taxable year ending
Sec. 6654(a)
Sec. 6661(a)
December 31, 1977
$ 2,044.08
-
December 31, 1978
2,074.74
-
December 31, 1979
3,214.00
-
December 31, 1980
8,041.81
-
December 31, 1981
14,280.04
-
December 31, 1982
5,161.27
$ 5,301.34
December 31, 1983
3,895.24
6,536.90
Alternatively respondent determined that petitioners are liable for the additions to tax for negligence and failure to timely file if they are not found liable for the fraud addition. *94 Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the taxable years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. These cases were consolidated for trial, briefing, and opinion. Unless otherwise indicated, all references to petitioners individually will be to Mrs. Lucia or Mr. Lucia, as the case may be. Respondent concedes that Mrs. Lucia did not receive income from her partnership Michell Lynn Hair Design in 1981, 1982, and 1983, of $ 6,000, $ 12,000, and $ 12,000, respectively, and that she is not liable for the additions to tax for fraud. After concessions by all parties, the issues for decision are (1) whether Mrs. Lucia received unreported taxable income during the taxable years in issue other than the income from Mr. Lucia's Air Force pension; (2) if so, whether she is relieved from liability under section 66(c), or entitled to a theft loss deduction under section 165(e); (3) whether Mrs. Lucia is liable for the additions to tax for negligence and failure to timely file as determined by respondent; (4) whether Mr. Lucia is exempt from Federal income tax; (5) whether Mr. *95 Lucia is liable for the additions to tax for fraud as determined by respondent, or alternatively for the additions to tax for negligence and failure to timely file; (6) whether petitioners are liable for the addition to tax under section 6654 for failure to pay estimated taxes for all years in issue; and (7) whether petitioners are liable for the addition to tax under section 6661(a) for taxable years 1982 and 1983. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and accompanying exhibits are incorporated herein. Petitioners resided in Hesperia, California, at the time they filed their separate petitions in this Court. At all relevant times Mr. Lucia was a citizen of the United States and resided in the State of California. During the years in issue petitioners lived together in a jointly owned house at 9510 Cerra Vista, Apple Valley, California. 1. General Facts
a. Background
Mrs. Lucia was an 18-year-old high school graduate when she married Mr. Lucia in 1954. He was in the Air Force. Mr. Lucia was the primary wage earner during their marriage, while Mrs. Lucia raised their five children and looked *96 after their home. Although Mr. Lucia worked various odd jobs in addition to his military job, his military pay was petitioners' main source of income. However, between November 1975 and December 1983 petitioners' financial situation changed. In November or December 1975 Mr. Lucia purchased an unincorporated retail paint business named "Paintin' Place." In mid-1977 he retired as a Major from the Air Force, [2] and by 1981 he had chartered a church named "Rainbow Church of Christ" (Rainbow Church or the Church). Mrs. Lucia, on the other hand, worked for Barstow Marine Base for three or four months during 1976, *97 and in 1977 earned $ 9,496.93 [3] in wages working as a data entry clerk for Pfizer, Inc. b. Bank Accounts
Between 1973 and 1982 petitioners opened at least eight bank accounts, i.e., five joint personal, two sole proprietorship (business), and one "Association" (business). See appendix A. The two sole proprietorship accounts were opened by Mr. Lucia under the name "Paintin' Place." [4] The association account was opened by Mr. Lucia under the name "Rainbow Church of Christ." Petitioners had signature authority on all eight accounts. Their son Louis Lucia had signatory authority on the three business accounts. Mr. Lucia maintained two of the personal accounts [5] and Paintin' Place's accounts at his place *98 of business at 9476 Third Avenue. All four banks statements were mailed to the Third Avenue address. Additionally, Mr. Lucia maintained the account for Rainbow Church. He was listed as "Trustee" of the account, while Mrs. Lucia and Louis were listed as "Alternate Trustees." The bank statements were mailed to 16628 Elm Street, Hesperia, California, petitioners' second house. Mrs. Lucia personally opened only one of the eight accounts, i.e., a joint personal account with High Desert Federal Credit Union (43735) in August or September of 1981. Mr. Lucia's retirement checks, Mrs. Lucia's mother's Social Security checks, and checks Mrs. Lucia received from her brothers and sisters for taking care of their mother were deposited into this account. Mrs. Lucia considered this account her own, although her mother and Mr. Lucia had signatory authority over it and wrote checks on it. On April 8, 1983, either Louis Lucia or Mr. Lucia opened a business *99 account with High Desert National Bank (1003860-01) under the name "Automotive Paintin' Place" (Automotive). This business was located at 16268A Main Street, Hesperia, California, and the bank statements were mailed to that address. The Bank-Depositor Agreement states that the account was opened as a sole proprietorship. Louis Lucia signed the agreement first, and Mr. Lucia signed it last. Mrs. Lucia did not have signatory authority over this account. Mr. Lucia and Louis wrote checks on this account to pay personal and business expenses. During 1983 $ 61,491.55 was deposited into this account. c. Loans and Ownership of Property
During the years in issue, petitioners obtained loans from various banks and used the proceeds to jointly purchase real and personal property. Neither the loan documents nor the title(s) to the properties purchased indicate that the property belonged entirely to either Mr. or Mrs. Lucia as their individual separate property. In or around March 1976 Mr. Lucia purchased the property he rented to conduct his retail paint business located at 9476 Third Avenue, Hesperia, California. He caused the deed to this property to be titled in petitioners' *100 names as joint tenants. In November 1980 petitioners jointly purchased a second house located at 16628 Elm Street, Hesperia, California. Mrs. Lucia's mother occasionally lived in this house. Petitioners received personal mail and mail addressed to Rainbow Church at this address. d. Air Force Retirement Income
Mrs. Lucia used the income from the Air Force retirement checks to pay petitioners' personal bills. However, when the retirement income was insufficient, Mr. Lucia would make up the difference with funds deposited into one of the four accounts he maintained at his business. Usually, Mr. Lucia provided Mrs. Lucia with one of these checkbooks from which she would write the necessary checks. Thereafter, Mrs. Lucia would return the checkbook to Mr. Lucia. 2. Business Activities
a. Paintin' Place
Paintin' Place's business activities include the retail sale of paint, sundries, wallpaper, drywall, and drywall finishing materials. Additionally, Mr. Lucia dealt with paint and drywall contractors. Cash and checks were accepted in payment for all merchandise, and Mr. Lucia used the daily cash register and customers' charge receipts to total his sales and accounts *101 receivable monthly. He also removed cash from the register to pay his employees' wages and other business expenses, without keeping adequate records of the total amount of cash removed. Sometime in 1980 or 1981 Mr. Lucia purchased a computer to keep records of his sales and accounts receivables. None of the business records were introduced at trial. Mrs. Lucia was not a salaried employee of Paintin' Place, and did not make business decisions. However, she worked between 3 and 6 hours a week performing various services on its behalf. Mrs. Lucia paid bills, filed papers with the court, delivered Paintin' Place's business records to Mr. Lucia's accountant, and occasionally helped customers with their purchases. Petitioners' sons, Louis and Gerald, occasionally worked at Paintin' Place. They were not paid a salary, but would, with Mr. Lucia's knowledge and approval, help themselves to the cash in the register. Mr. Lucia failed to keep records of the amount of cash his children removed from the register. For taxable years 1979 through 1983 approximately $ 870,898.93 was deposited into the four joint accounts Mr. Lucia maintained at his place of business. See appendix B. At *102 all relevant times petitioners wrote checks for personal and business purposes on all four accounts. However, they failed to maintain accurate records reflecting the personal versus business expenses paid. In or around September 1981 Mr. Lucia caused the bank statements of petitioners' joint account with High Desert Federal Credit Union (26054-06) to be mailed to the Third Avenue business address. During taxable years 1979 through 1983 petitioners deposited a total of $ 2,402,028.24 into this account. See appendix C. Cash (versus checks) was never deposited in any of these accounts during the years in issue. b. Rainbow Church
Before and during 1979 Mr. Lucia attended various tax protestor meetings and heard that he could charter a church in an attempt to avoid taxes. Sometime in or around 1979 Mr. Lucia put this information into action and chartered a Pentecostal Church named the "Rainbow Church of Christ." Mr. Lucia never filed for exempt status. Mr. Lucia was the only minister in the Church, although he did not have any formal training in that vocation. The Church held irregular services in irregular places, because it did not have its own building. Although Mrs. *103 Lucia did not receive a salary from Rainbow Church, she performed various ministerial services on its behalf. She paid bills from and made deposits to the checking account, all under her husband's direction. Although checks were deposited into the account during the years in issue, cash was not. Petitioners wrote checks on the Church account to pay their personal bills. For example, they paid their sons Gerald's and Sam's tuition to Hesperia Christian School and utilities on their personal residence. They did not keep any records indicating the total business and personal expenses paid out of the Church's account. In 1983 petitioners jointly signed deeds transferring Paintin' Place's Third Avenue building, their two houses, and various lots they acquired jointly, to the Rainbow Church. Some of the property was later deeded back to petitioners and third parties in exchange for other property. 3. Other Facts
In 1980 Mrs. Lucia asked Mr. Lucia if he would financially help her start a business with a Monica Sivirley. He agreed to help and gave her $ 6,000. There was no agreement that Mrs. Lucia would repay Mr. Lucia the $ 6,000. Mrs. Lucia gave this money to Monica Sivirley, *104 and together they started Michell Lynn Hair Design, a partnership. In or around 1981 Mr. Lucia boasted to Daniel Millard, a customer of Paintin' Place, that he had not paid Federal income taxes for the past few years. He also suggested to Mr. Millard that he not pay his taxes. 4. Tax Returns
Mr. Lucia obtained the services of an accounting firm to prepare petitioners' joint Federal income tax returns for taxable years 1977 through 1982. He provided the firm with only the information he wanted used to prepare the returns. That information was incomplete. Additionally, he failed to provide the accountant with any information relating to Rainbow Church. Mrs. Lucia signed joint returns for taxable years 1977 through 1982. However, unknown to Mrs. Lucia, Mr. Lucia never filed them. A return for taxable year 1983 was never prepared, signed, or filed. In October and November of 1982 an Internal Revenue Service (IRS) agent wrote petitioners requesting tax return information. On December 7, 1982, Mr. Lucia responded with standard tax protestor arguments and demands. [6]
*105 Again, shortly before December 24, 1984, another IRS agent wrote petitioners requesting tax information for their prior taxable years. The agent also contacted Eugene A. Helsley, petitioners' accountant. On or around December 24, 1984, immediately after learning that the IRS had contacted Mr. Helsley, Mr. Lucia contacted Mr. Helsley requesting that all records, forms, working papers, or paperwork of Paintin' Place be turned over to him. Mr. Lucia intended to maintain them personally. On or around that same day, Mr. Lucia picked up copies of petitioners' income tax returns for 1974, 1975, 1976, 1979, 1980, 1981 (original and amended), and 1982, and all bookkeeping records for Paintin' Place from 1976 through 1984. Mr. Lucia refused to provide any business or personal records from which respondent could determine petitioners' income tax liability. Accordingly, respondent determined petitioners' tax liability for 1979 through 1983 using the bank deposits method. Bank records, however, were not available for 1977 and 1978. Accordingly, respondent determined petitioners' gross receipts from Paintin' Place for those years by determining the average annual business growth for taxable *106 years 1979 through 1983, and using the gross receipts (bank deposits) for those years, interpolated the growth figures for taxable years 1977 and 1978. Respondent made allowances for inter-account transfers. Next respondent determined cost of goods sold and other business expenses for 1979 through 1983 to arrive at taxable income. Then the average ratio of net profits to gross receipts for those years was determined. The net profit for taxable years 1977 through 1979 was determined by applying the average ratio of net profits to gross receipts determined from 1980 through 1983 to the calculated gross receipts for 1977 through 1979. Respondent properly made allowances for the retirement income so it would not be taxed twice. Respondent then allocated one half of the taxable income received to each petitioner in accordance with the community property laws of the State of California. In or around October 1986 petitioners received their respective statutory notices of deficiency at the Elm Street house. This was the first time Mrs. Lucia actually learned that Mr. Lucia had failed to file the returns for taxable years 1977 through 1982. Shortly thereafter, petitioners agreed to *107 separate, and Mr. Lucia moved out of the Cerra Vista house. Petitioners never signed a formal separation agreement. OPINION Petitioners do not challenge the amounts of the deficiencies as set forth in their respective statutory notices. Rather, Mrs. Lucia contends that all the income from the businesses is Mr. Lucia's separate property, not community property, and, therefore, she is not liable for the tax thereon. Mr. Lucia contends that he is not subject to Federal income tax. Mrs. Lucia
1. Community Property
The first issue we must decide is whether the interest income and the income from Paintin' Place, Automotive, and Rainbow Church is community property or Mr. Lucia's separate property. Mrs. Lucia bears the burden of proving that these items of income are not community income. Rule 142(a); Caswell v. United States, 205 F. Supp. 576 (N.D. Cal. 1962). Mrs. Lucia contends that in 1977 she and Mr. Lucia entered into an oral agreement for the division of property, whereby she agreed to receive as her separate property all of Mr. Lucia's retirement income, and Mr. Lucia agreed to receive as his separate property all income from his businesses. *108 Respondent contends that petitioners did not enter into an agreement, but even if they did, the agreement was not fully consummated. We agree with respondent. California is a community property State. Therefore, we look to California law to determine whether the income from the businesses belonged to the community, or whether it is Mr. Lucia's separate property. United States v. Mitchell, 403 U.S. 190, 197, 29 L. Ed. 2d 406, 91 S. Ct. 1763 (1971); Sampson v. Commissioner, 81 T.C. 614, 618 (1983), affd. without published opinion 829 F.2d 39 (6th Cir. 1987), cert. denied 487 U.S. 1235 (1988). [7]
The term "community property" is defined under California law as "property acquired by *109 husband and wife, or either, during marriage, when not acquired as the separate property of either." Cal. Civ. Code sec. 687 (West 1982). Generally, absent an agreement to the contrary, each spouse has a vested interest in and is owner of one-half of all the community income from the moment it is acquired, and, therefore, is liable for the Federal income tax on one half thereof. United States v. Mitchell, 403 U.S. at 196; [8]Bender v. Pfaff, 282 U.S. 127, 75 L. Ed. 252, 51 S. Ct. 64 (1930). [9] This is true regardless of whether the spouse actually "received" or "enjoyed" her share of the income. Cf. Kimes v. Commissioner, 55 T.C. 774, 782 (1971). *110 Husband and wife may agree, orally or otherwise, to transform community property into the separate property of either, and vice versa. Cal. Civ. Code sec. 5103 (West 1983); Wikes v. Smith, 465 F.2d 1142 (9th Cir. 1972); Estate of Vogel v. Commissioner, 278 F.2d 548, 550 (9th Cir. 1960), affg. 30 T.C. 125 (1958); Edwards v. Deitrich, 118 Cal. App. 2d 254, 257 P.2d 750 (1953). [10]
Although it is not essential to show an express oral agreement, persuasive evidence of the parties' intent to change the form of the property must be shown. This intent may be *111 shown by circumstantial and/or direct evidence. Geller v. Geller, 115 Cal. App. 2d 822, 253 P.2d 52 (1953); Long v. Long, 88 Cal. App. 2d 544, 199 P.2d 47 (1948); Marvin v. Marvin, 46 Cal. App. 2d 551, 556, 116 P.2d 151, 154 (1941); Kenney v. Kenney, 220 Cal. 134, 136, 30 P.2d 398 (1934). Mrs. Lucia's testimony was confusing and inconsistent as to the time they entered into the agreement. She stated that they entered into the agreement in 1977 before Mr. Lucia began his Paintin' Place business. Mr. Lucia, however, acquired the business in late 1975. She was also mistaken on the extent of her involvement in the business activities. We find Mrs. Lucia's testimony unconvincing and, therefore, do not rely on it in deciding this issue. See Geiger v. Commissioner, 440 F.2d 688, 689-690 (9th Cir. 1971), affg. per curiam a Memorandum Opinion of this Court; [11]Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). *112 Based on the following nonexclusive list of factors, we find petitioners' subsequent acts inconsistent with the alleged oral agreement, and conclude that a transmutation in the status of the property did not occur. Mrs. Lucia's name appeared jointly with Mr. Lucia's on five bank accounts, and she had signature authority over all eight accounts. Thus, the funds contained therein were available to her at any time. At times, Mrs. Lucia used these funds to pay petitioners' joint living expenses. Moreover, Mr. Lucia wrote at least one check out of the account Mrs. Lucia considered her own separate account, which he did not repay. Mrs. Lucia also executed joint loan application documents with Mr. Lucia throughout the years in issue. Her name appeared as a joint tenant on the deeds to the property they purchased. Even if petitioners orally agreed to keep certain income separate, we find they failed to act accordingly. Thus, we conclude that the interest income and the income from Paintin' Place and Rainbow Church is community income. Additionally, we find the income from Automotive is community property and properly includable in petitioners' income. [12] Although Mrs. Lucia did *113 not have signature authority over that account, petitioners' actions as a whole negate any inference that they actually agreed to keep any of their income or property separate. Thus, any income Mr. Lucia received from that business remains community property. 2. Section 66(c) [13]/Section 165
We must next determine whether petitioner *114 qualifies for relief under section 66(c), if not, whether she is entitled to a theft loss deduction. Petitioner bears the burden of proof. Rule 142(a). a. Section 66(c)
The purpose of section 66 is to provide relief from unreported community income which, pursuant to the rules of section 879(a), is more appropriately attributable to the other spouse. Section 66(a) is inapplicable in this case, because petitioners did not live apart at any time during the taxable years in issue. Accordingly, we look to section 66(c). To qualify under section 66(c) petitioner must satisfy all four of the following conditions: (1) she must not have filed a joint return with Mr. Lucia for any of the years in issue, (2) she must not have included in her gross income for any of the years in issue an item of community income properly includable therein which, in accordance with the rules contained in section 879(a), would be treated as the income of Mr. Lucia, (3) she must establish that she did not know, and had no reason to know, of the item of community income, and, (4) taking into account all facts and circumstances, it is inequitable to include such item of community income in her gross *115 income. If all four of these prerequisites are satisfied, then the item of unreported community income is includable in the income of the other spouse. The first prerequisite is satisfied, since no returns for the years in issue were actually filed. Additionally, the first part of the second requirement is met, since Mrs. Lucia failed to include items of community income that were properly includable. i. Section 66(c)(2), second part
Section 879(a) attributes (1) "earned income" to the spouse who performed the services [sec. 897(a)(1)], (2) trade or business income in accordance with section 1402(a)(5)[sec. 879(a)(2)], (3) community income not described in either (1) or (2) which is derived from the spouse's separate property, to such spouse [sec. 879(a)(3)], and (4) all other community income in accordance with the applicable community property law [sec. 879(a)(4)]. The income from Automotive is the only item of community income we need address under this prerequisite, since as discussed below, section 66(c)(3) is not satisfied as to the other items of community income. The income from Automotive constitutes income derived from a trade or business. Therefore, we look *116 to section 1402(a)(5), which provides as follows: (5) if -- (A) any of the income derived from a trade or business (other than a trade or business carried on by a partnership) is community income under community property laws applicable to such income, all of the gross income and deductions attributable to such trade or business shall be treated as the gross income and deductions of the husband unless the wife exercises substantially all of the management and control of such trade or business, in which case all of such gross income and deductions shall be treated as the gross income and deductions of the wife; * * * We find that the income from Automotive Paintin' Place is properly attributable to Mr. Lucia. Mrs. Lucia did not have anything to do with the management or control of Automotive. She had no authority to write checks on the account. Moreover, nothing in the record indicates that she knew the business existed. Accordingly, the second part of section 66(a)(2) is satisfied with respect to the income derived from Automotive. ii. Section 66(c)(3)
Whether a spouse knows or has reason to know of the omission is essentially factual, and the test to be applied is *117 what a reasonably prudent person would or should know of the circumstances, keeping in mind such person's level of intelligence, education, and experience. Shea v. Commissioner, 780 F.2d 561, 566 (6th Cir. 1986), affg. on this issue a Memorandum Opinion of this Court. [14] Furthermore, the requisite knowledge is not of the tax implications of the circumstances which give rise to the omission, but rather the circumstances themselves. Guth v. Commissioner, 897 F.2d 441, 444 (9th Cir. 1990), affg. a Memorandum Opinion of this Court; [15] *118 Stevens v. Commissioner, 872 F.2d 1499, 1505 (11th Cir. 1989), affg. a Memorandum Opinion of this Court. [16] Cf. Bokum v. Commissioner, 94 T.C. 126, 145-146 (1990); Purcell v. Commissioner, 86 T.C. 228, 238 (1986), affd. 826 F.2d 470 (6th Cir. 1987). After reviewing the evidence, it is obvious that Mrs. Lucia knew of Mr. Lucia's business activities in Paintin' Place and Rainbow Church. She participated in them. Moreover, she knew her name appeared either jointly or as a signatory on all eight bank accounts. Thus, we find she knew of the facts giving rise to the omission of income. Accordingly, section 66(c)(3) is not satisfied with respect to those items. However, for the reasons stated supra in "Section 66(c)(2), second part," we find that section 66(c)(3) is satisfied with respect to the omission relating to Automotive. Thus, we find that Mrs. Lucia neither knew nor had reason to know of this item of community income. iii. Section 66(c)(4)
Lastly, we believe that under all the circumstances, it would be inequitable to include the income from Automotive in Mrs. Lucia's income. There is no evidence that she "benefited," significantly or otherwise, from this income. Based on the foregoing, we conclude *119 that Mrs. Lucia is relieved from tax liability under section 66(c) only on the income derived from Automotive. b. Section 165
We must next decide whether Mrs. Lucia is entitled to a theft loss deduction under section 165 for the remaining items of community income. Mrs. Lucia alleges that if the taxable income as determined by respondent is community income, she is entitled to deduct her 50-percent share as a theft loss, because Mr. Lucia in effect stole her portion of the community income out of the checking accounts. Respondent contends petitioner is not entitled to a theft loss deduction. For the reasons stated below, we agree with respondent. Section 165(c)(3) generally allows the deduction of a loss incurred as the result of theft if not compensated for by insurance or otherwise. Sec. 165(a), (c)(3), (e). In order for a deduction to be allowed, however, Mrs. Lucia must prove (1) a theft occurred; (2) a loss was sustained as a result of the theft; (3) the year the loss was sustained; and (4) the amount of the loss. Sec. 165(a) and (e); secs. 1.165-7(b) and 1.165-8(c), Income Tax Regs. The question of whether a theft occurred is determined under the law of the State *120 where the alleged loss occurred, in this case California. Bellis v. Commissioner, 540 F.2d 448, 449 (9th Cir. 1976), affg. 61 T.C. 354 (1973); Luman v. Commissioner, 79 T.C. 846, 860 (1982). Under California law, a theft, sounding in embezzlement, is defined as "the fraudulent appropriation of property by a person to whom it has been entrusted." Cal. Penal Code sec. 503 (West 1988). See Cal. Penal Code secs. 484(a) and 490a (West 1988). We must decide whether, under the facts of this case, a theft occurred. We are satisfied it did not. We found that the interest income and income from Paintin' Place and Rainbow Church was community income. The respective interests of husband and wife in community property during the marriage are present, existing, and equal interests. See Cal. Civ. Code sec. 5105 (West 1983); Cal Civ. Code sec. 687 (West 1982). Moreover, we find that it remained community property even though immediately upon receipt it was placed in a joint checking account. [17] See In re Kretschmer's Estate, 232 Cal. App. 2d 789, 43 Cal. Rptr. 121 (1965). Accordingly, during all years *121 in issue, each spouse had an equal right to the management and control, and hence possession, of the community income. Cal Civ. Code sec. 5125(a) (West Supp. 1983). Moreover, each had signatory authority over the bank accounts. Consequently, Mr. Lucia's removal of the funds does not constitute a theft under California law. See Tyler v. Commissioner, 13 T.C. 186, 193 (1979); Dandeneau v. Commissioner, T.C. Memo 1971-128, affd. without published opinion sub nom. Browne v. Commissioner, 456 F.2d 799 (5th Cir. 1972); [18]People v. Andary, 120 Cal. App. 2d 675, 261 P.2d 791 (1953). Moreover, *122 even if there was a theft under California law, Mrs. Lucia has not established the amount of money Mr. Lucia converted to his own use, or that no part of those funds were used for her benefit. See Weingarten v. Commissioner, 38 T.C. 75 (1962); Dandeneau v. Commissioner, T.C. Memo 1971-128. On the contrary, the record clearly establishes that a substantial portion of the funds in the eight accounts was used to benefit the community. Accordingly, we hold for respondent on this issue.
3. Additions To Tax
Mrs. Lucia stated on brief "Numerous penalties are asserted against Petitioner-Wife in the Statutory Notice. It is understood that Respondent will concede the penalties on Brief." Respondent, however, conceded only those additions to tax resulting from fraud. Accordingly, Mrs. Lucia bears the burden of proof as to these remaining additions. Rule 142(a). a. Section 6651(a)(1)
We must decide whether Mrs. Lucia is liable for a 25-percent addition to tax under section 6651(a)(1) for failure to timely file Federal income tax returns for all years in issue. To avoid the addition Mrs. Lucia must prove that her failure to file was *123 "due to reasonable cause and not due to willful neglect." United States v. Boyle, 469 U.S. 241, 243, 83 L. Ed. 2d 622, 105 S. Ct. 687 (1985); Gardner v. Commissioner, T.C. Memo 1987-420, affd. without published opinion 884 F.2d 1392 (6th Cir. 1988). Reasonable cause has been defined as the exercise of "ordinary business care and prudence." Sec. 301.6651-1(c)(1), Proced. & Admin. Regs. Willful neglect is a conscious, intentional failure, or reckless indifference. United States v. Boyle, 469 U.S. 241, 83 L. Ed. 2d 622, 105 S. Ct. 687 (1985). Mrs. Lucia signed returns for taxable years 1977 through 1982 and thought her husband filed them. She did not actually know that Mr. Lucia failed to file those returns until she received her statutory notice of deficiency. It is clear that she relied upon Mr. Lucia to file the returns she signed, and believed he had filed them. However, "The failure to make a timely filing of a tax return is not excused by the taxpayer's reliance on an agent, and such reliance is not "reasonable cause" for a late filing under section 6651(a)(1)." United States v. Boyle, 469 U.S. at 252. Thus, filing a tax return is a nondelegatable *124 duty. Accordingly, we find the addition to tax is warranted for all taxable years in issue. b. Section 6653(a)
The next issue for decision is whether Mrs. Lucia is liable for the additions to tax for negligence. Section 6653(a) (applicable to taxable years 1977 through 1980) and section 6653(a)(1) (applicable to taxable years 1981 through 1983) provides for an addition to tax equal to 5 percent of the underpayment if any portion of the underpayment is due to negligence. Section 6653(a)(2) (applicable to taxable years 1981 through 1983) provides for an addition to tax equal to 50 percent of the interest payable on the portion of the underpayment due to negligence. Negligence is defined as the lack of due care, or failure to act as a reasonable person would act under the same circumstances where there is a legal duty to act. Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. in part and remanding in part 43 T.C. 168 (1964); Neely v. Commissioner, 85 T.C. 934, 947 (1985). Mrs. Lucia bears the burden of proving that no part of the underpayments is due to negligence or intentional disregard of rules and *125 regulations. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757 (1972). Taxpayers have a statutory duty to timely file their income tax returns. Sec. 6072. A breach of this duty is sufficient evidence of negligence. See Emmons v. Commissioner, 92 T.C. 342, 349 (1989), affd. 898 F.2d 50 (5th Cir. 1990). We found there was no reasonable excuse or justification for Mrs. Lucia's failure to file the returns. For the same reasons, we find Mrs. Lucia negligent under section 6653(a)/(a)(1) for taxable years 1977 through 1983. Additionally, we find the addition to tax under section 6653(a)(2) is warranted on the entire underpayment for all taxable years, except that the 1983 underpayment amount is reduced in accordance with our finding under section 66(c) on the income derived from Automotive. Mr. Lucia
4. Exempt Status
The next issue for consideration is whether Mr. Lucia is exempt from Federal income tax. Mr. Lucia does not contest respondent's determinations for any of the years in issue, but raises a plethora of long-discredited protestor arguments. [19] He asserts that as a citizen and resident of the State of *126 California, he is exempt from unapportioned tax under article IV, section 2, clause 1 of the U.S. Constitution, that he did not have any foreign earned income, and therefore, respondent had no delegated authority to issue the statutory notice of deficiency. Mr. Lucia is not exempt from Federal income tax. See Abrams v. Commissioner, 82 T.C. 403, 408 (1984); Urban v. Commissioner, T.C. Memo 1990-249. Moreover, his assertion that respondent lacked authority to issue a notice of deficiency to him is rejected along with the *127 other tax protestor arguments he made. See Stamos v. Commissioner, 95 T.C. 624 (1990); Brock v. Commissioner, T.C. Memo 1990-197, 1990 Tax Ct. Memo LEXIS 216, 59 T.C.M. (CCH) 433, 436, T.C.M. (RIA) 90197 at 929. 5. Section 6653(b)
The next issue for consideration is whether Mr. Lucia is liable for the addition to tax for fraud. Sections 6653(b) (applicable to the tax years 1977 through 1981) and 6653(b)(1) (applicable for tax years 1982 and 1983) provide for an addition to tax equal to 50 percent of the underpayment of the tax required to be shown on a return, if any part of the underpayment is due to fraud. Section 6653(b)(2) (applicable to tax years 1982 and 1983), provides an additional amount equal to 50 percent of the interest on the portion of the underpayment attributable to fraud. Respondent bears the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b); Stone v. Commissioner, 56 T.C. 213, 220 (1971). This burden may be met by showing (1) that an underpayment [20] exists, and (2) that Mr. Lucia intended to evade taxes which he knew to be owing, by actions intended to conceal, *128 mislead, or otherwise prevent the collection of taxes. Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Parks v. Commissioner, 94 T.C. 654 (1990); Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). The existence of fraud is a question of fact that must be resolved upon a consideration of the entire record. Rowlee v. Commissioner, supra at 1123; Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud is never presumed, Beaver v. Commissioner, 55 T.C. 85, 92 (1970), but may be proved by circumstantial evidence, because direct proof of the taxpayer's intent is rarely available. *129 Rowlee v. Commissioner, supra at 1111; Stephenson v. Commissioner, 79 T.C. 995, 1005-1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984); Gajewski v. Commissioner, 67 T.C. at 200. The intent to conceal or mislead may be inferred from a pattern of conduct. See Spies v. United States, 317 U.S. 492, 499, 87 L. Ed. 418, 63 S. Ct. 364 (1943). A pattern of consistent underreporting of income, especially when accompanied by other circumstances showing an intent to conceal, justifies the inference of fraud. Holland v. United States, 348 U.S. 121, 137, 99 L. Ed. 150, 75 S. Ct. 127 (1954); Merritt v. Commissioner, 301 F.2d 484, 487 (5th Cir. 1962), affg. a Memorandum Opinion of this Court. [21] However, mere failure to file is not sufficient to establish fraud. Kotmair v. Commissioner, 86 T.C. 1253 (1986). Other badges of fraud *130 include: maintaining inadequate records; failing to make estimated tax payments; failing to cooperate with tax authorities; dealing in cash; and concealing assets. Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. a Memorandum Opinion of this Court. [22]
Mr. Lucia admits he had tax returns prepared for 1977 through 1982, that Mrs. Lucia signed them, and that he intentionally did not file them. Thus, aware of his duty to file, Mr. Lucia nevertheless intentionally failed to do so. Consequently, he knowingly failed to report substantial amounts of income. Additionally, Mr. Lucia failed to keep adequate business and personal records, and failed to make estimated tax payments. He attempted to conceal assets from respondent by transferring the business property, personal residences, and other jointly owned property to the Rainbow Church, while continuing *131 to have effective ownership and control over said properties during the years in issue. Further, Mr. Lucia tried to obstruct respondent's examination of his income tax liability for the years in issue by not cooperating with the Service's examination. He also told at least one other person, Mr. Millard, that he had not paid taxes in five years, and suggested to Mr. Millard that Mr. Millard not pay. Based on the foregoing, it is clear Mr. Lucia intended to conceal, mislead, and prevent the collection of taxes he knew to be owing. Accordingly, respondent satisfied his burden of proof for each year in issue. Thus, Mr. Lucia is liable for the addition under section 6653(b)/(b)(1) for each of the years in issue. Moreover, we conclude that the entire underpayment of tax for each year was attributable to fraud. Thus, Mr. Lucia is liable for the addition under section 6653(b)(2) for 1982 and 1983 on the entire underpayment. We note that the underpayment for 1983 is increased by the amount we determined Mrs. Lucia was not liable for under section 66(c). Mr. and Mrs. Lucia
6. Section 6654
The next issue for consideration is whether petitioners are liable for the addition *132 to tax for failing to pay estimated taxes. Section 6654(a) mandates an addition to tax where prepayments of tax, either through withholding or by making quarterly estimated payments during the year, do not equal certain percentages specified under the statute, unless the taxpayer comes within one of several exceptions not applicable herein. Recklitis v. Commissioner, 91 T.C. 874, 913 (1988); Grosshandler v. Commissioner, 75 T.C. 1, 20-21 (1980). Petitioners have failed to show that one of the exceptions applies for any of the years in issue. Accordingly, we hold for respondent on this issue. 7. Section 6661(a)
The last issue we must decide is whether petitioners are liable for the 25-percent addition [23] to tax under section 6661(a) for substantial understatement of income tax with respect to taxable years 1982 and 1983. Petitioners bear the burden of proof on this issue. Rule 142(a). *133 An understatement is substantial if it exceeds the greater of $ 5,000 or 10 percent of the amount required to be shown on the return. Petitioners failed to introduce any evidence on this issue. Accordingly, we sustain respondent's determination. To reflect the foregoing, Decisions will be entered under Rule 155. Appendix A 1. Tokai Bank (06-052576), joint personal account, opened 1973. Statements mailed to petitioners' personal residence on Cerra Vista. 2. High Desert Federal Credit Union (26054), joint personal account, opened by Mr. Lucia on September 25, 1973. Statements were mailed to petitioners' personal residence on Cerra Vista until September 1981. Thereafter, Mr. Lucia caused them to be mailed to Paintin' Place on Third Avenue. By 1982 at the latest, the front of the checks bore the following information: F. J. Lucia N.A. Lucia DBA Paintin' Place 9476 Third Avenue 714 244-5524 Hesperia, CA 92345 3. Security Pacific National Bank (003295), "Paintin' Place" business account, opened by Mr. Lucia on December 10, 1975. Statements were mailed to Paintin' Place address on Third Avenue. On July 9, 1981, the signature card was updated to include either *134 Mrs. Lucia or Louis Lucia, or both. 4. Bank of America (0472-0-02410), individual checking account, opened by Mr. Lucia on March 2, 1979. Statements were mailed to Paintin' Place on Third Avenue. On January 1, 1980, Mrs. Lucia was added and the account was held jointly. During 1981 Mrs. Lucia wrote checks on this account. The account was closed on August 31, 1982. 5. Desert Community Bank (01109545-06), joint personal checking and savings accounts, opened May 22, 1980. Statements were mailed to Paintin' Place on Third Avenue. 6. High Desert Federal Credit Union (43735), joint personal checking account, opened in August of 1981, by Mrs. Lucia. Mrs. Lucia's mother, Mrs. Clemments, and Mr. Lucia owned the account jointly and had signature authority over the account. All statements were mailed to 16628 Elm Street, petitioners' second house. 7. High Desert National Bank (1001019-01) sole proprietorship account under the name "Paintin' Place", opened May 24, 1982. Statements were mailed to Paintin' Place on Third Avenue. 8. High Desert National Bank (01001027-01) "Rainbow Church of Christ" -- Business "Association" account, opened May 24, 1982. Statements were *135 mailed to 16628 Elm Street, petitioners' second house. Appendix B (1) the business account at Security Pacific National Bank (003-295): 1979 -
$   7,356.14
1980 -
90,745.86
1981 -
95,984.70
1982 -
62,935.30
1983 - 18,719.07
$ 275,741.07
(2) the business account at High Desert National Bank (0100101900-01): 1982 -
$ 101,431.70
1983 -
93,727.28
$ 195,158.98
(3) the personal account at the Bank of America (0472-02410-1): 1979 -
$  38,664.72
1980 -
93,312.84
1981 -
186,698.59
1982  40,094.11
$ 358,770.26
(4) the personal account at Desert Community Bank (01109545-06): 1980 -
$ 14,160.39
1981 -
9,252.24
1982 -
--     1983 -
17,815.99
$ 41,228.62
TOTAL: $ 870,898.93 Appendix C Deposits made into petitioners' account with High Desert Federal Credit Union (26054-06): 1979 -
$   220,375.40
1980 -
381,399.10
1981 -
460,807.71
1982 -
488,977.49
1983 -
850,468.54
$ 2,402,028.24
*136 Footnotes
1. Section 6653(b) was amended by the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, sec. 325(a), 96 Stat. 324, 616. Section 6653(b)(1) and (2)↩ apply with respect to taxes the last day prescribed by law for payment of which is after September 3, 1982.
*. 50 percent of the interest due on the portion of the underpayment attributable to fraud. ↩
*. 50 percent of the interest due on the portion of the underpayment attributable to fraud.↩
2. For reasons not relevant here, petitioners did not begin receiving the retirement income until July or August 1978. Between 1978 and 1983 petitioners received Air Force Military Retirement income as follows: ↩
Taxable year
Amount paid
Tax withheld
1978
$ 5,088.31
$ 285.81
1979
13,965.52
433.18
1980
16,318.94
-0- 1981
17,928.86
-0- 1982
19,364.68
-0- 1983
20,112.21
2,855.39
3. $ 1,220.59 was withheld for Federal income taxes.↩
4. Security Pacific National Bank (003-295) and High Desert National Bank (100101900-01).↩
5. Bank of America (0472-0-02410) and Desert Community Bank (01109545-06).↩
6. Please inform me, in writing, the statutory authority which gives you the power or right to make any such inquiries or demands, stating in particular all facts on which you rely. Before any compliance of your requests may be considered, please answer the following questions, clearly and completely, so that I may better understand our respective positions: 1. Have you, Mr. * * *, taken an oath to uphold and defend the Constitution of [t]heUnited States? 2. Is the filing of a return required by law; or is it voluntary? 3. Can I be forced to give you, or anyone, information which may be used against me? 4. Do you know of any way that I can file a return without being a witness against myself? 5. Does a question of jurisdiction presently exist, and what ramifications concerning jurisdiction does my signing any agency document hold?↩
7. See Johnson v. Commissioner, 72 T.C. 340, 344 (1979); Estate of Williams v. Commissioner, 62 T.C. 400, 407 (1974); cf. Aquilino v. United States, 363 U.S. 509, 512-514, 4 L. Ed. 2d 1365, 80 S. Ct. 1277 (1960); Burnet v. Harmel, 287 U.S. 103, 77 L. Ed. 199, 53 S. Ct. 74↩ (1932).
8. In United States v. Mitchell, 403 U.S. 190, 197, 29 L. Ed. 2d 406, 91 S. Ct. 1763 (1971), the Supreme Court stated: with respect to community income, as with respect to other income, federal income tax liability follows ownership. In the determination of ownership, state law controls. "The state law creates legal interests but the federal statute determines when and how they shall be taxed." * * * [Citations omitted.] ↩
9. See Bagur v. Commissioner, 603 F.2d 491, 498 (5th Cir. 1979), remanding 66 T.C. 817 (1976); In re House's Marriage, 50 Cal. App. 3d 578, 123 Cal. Rptr. 451, (1975); Romanchek v. Romanchek, 248 Cal. App. 2d 337, 56 Cal. Rptr. 360 (1967); Winn v. Winn, 143 Cal. App. 2d 184, 299 P.2d 721 (1956); Berry v. Berry, 117 Cal. App. 2d 624, 256 P.2d 646 (1953); Sbarbaro v. Rosa, 48 Cal. App. 2d 584, 120 P.2d 151↩ (1941).
10. See James v. Pawsey, 162 Cal. App. 2d 740, 328 P.2d 1023 (1958); Long v. Long, 88 Cal. App. 2d 544, 199 P.2d 47 (1948); Tomaier v. Tomaier, 23 Cal. 2d 754, 757, 146 P.2d 905 (1944); In re Sehabiague's Estate, 47 Cal. App. 2d 793, 119 P.2d 30↩ (1941).
11. Geiger v. Commissioner, T.C. Memo 1969-159, affd. 440 F.2d 688↩ (9th Cir. 1971).
12. There are some indications that Louis, rather than Mr. Lucia, owned Automotive Paintin' Place. However, petitioners failed to present any evidence from which we can make that finding. Accordingly, we uphold respondent's determination that petitioners are the proper taxpayers to report the income therefrom.↩
13. Section 66(c) was added by the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 803, but is applicable to all cases pending. See Rimple v. Commissioner, T.C. Memo 1985-245↩.
14. Shea v. Commissioner, T.C. Memo 1984-310, affd. 780 F.2d 561↩ (6th Cir. 1986). 15. Guth v. Commissioner, T.C. Memo 1987-522, affd. 897 F.2d 441↩ (9th Cir. 1990). 16. Stevens v. Commissioner, T.C. Memo 1988-63, affd. 872 F.2d 1499↩ (11th Cir. 1989).
17. Mr. Lucia testified that petitioners took title to all income and property in joint tenancy for the purpose of facilitating transfer upon his death and for convenience. See May v. May, 262 Cal. App. 2d 668, 68 Cal. Rptr. 863↩ (1968). 18. Sanocki v. Commissioner, T.C. Memo 1989-26↩.
19. Mr. Lucia alleges that (1) he received no income from sources outside the United States during the years in question; (2) he is a citizen and resident of the United States not a nonresident; (3) the United States Constitution prevents Congress from imposing any direct tax within the States in the absence of apportionment; and (4) the Secretary delegated enforcement authority to the Commissioner only over United States Territories and Insular Possessions.↩
20. An underpayment for purposes of section 6653(b) equals the amount of tax imposed if a return is not filed on or before the last day prescribed for filing. Sec. 6653(c)↩; sec. 301.6653-1(c)(1)(ii), Proced. & Admin. Regs.
21. Merritt v. Commissioner, T.C. Memo 1959-172, affd. 301 F.2d 484↩ (5th Cir. 1962).
22. Bradford v. Commissioner, T.C. Memo 1984-601, affd. 796 F.2d 303↩ (9th Cir. 1986).
23. The Omnibus Budget Reconciliation Act of 1986, Pub. L. 99-509, sec. 8002(a), 100 Stat. 1874, 1951, increased the section 6661(a) addition to tax from 10 percent to 25 percent of the underpayment attributable to a substantial understatement for additions to tax assessed after October 21, 1986.↩